Judge McMahon

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA and the
STATES OF NEW YORK, CONNECTICUT
and MASSACHUSETTS *ex rel*. ZACHARY
WOLFSON,

                        Plaintiffs,

      vs.

PARK AVENUE MEDICAL ASSOCIATES,
PARK AVENUE MEDICAL ASSOCIATES
P.C., PARK AVENUE MEDICAL
ASSOCIATES PLLC, PARK AVENUE
HEALTH CARE MANAGEMENT, LLC,
PARK AVENUE HEALTH CARE
MANAGEMENT, INC., BRAD
MARKOWITZ, MITCHEL KAPLAN,
DANIEL SUSSMAN and ANTONY
MENDOLA,

                      Defendants.

Case No. **11 CIV 5107**

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**JURY TRIAL DEMANDED**

**Filed In Camera and**
**Under Seal Pursuant To**
**31 U.S.C. § 3730(b)(2)**

## COMPLAINT

Zachary Wolfson (hereinafter "Relator"), through his undersigned counsel, brings this *qui tam* action on behalf of the United States of America and the States of New York, Connecticut and Massachusetts and in his own name, under the Federal False Claims Act (hereinafter the "FFCA"), 31 U.S.C. § 3729 *et seq*.; the New York False Claims Act (hereinafter the "NYFCA"), NY State. Fin. Law, ch. 13 § 187 *et seq*.; the Connecticut False Claims Act (hereinafter the "CFCA"), Conn. Gen. Stat. § 17b-301a. *et seq*.; and the Massachusetts False Claims Act (hereinafter the "MFCA"), Mass. Gen. Law § 5A *et seq*.; and alleges against Defendants as follows:

## I.    NATURE OF THE CASE

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and the States of New York, Connecticut and Massachusetts arising from false claims made or caused to be made by Defendants to: (1) the United States and its agents and intermediaries in violation of the FFCA; (2) the State of New York and its agents and intermediaries in violation of the NYFCA; (3) the State of Connecticut and its agents and intermediaries in violation of the CFCA; and (4) the State of Massachusetts and its agents and intermediaries in violation of the MFCA.

2.    Defendant Park Avenue Medical Associates is a multi-specialty group practice which provides health care services in New York, Connecticut and Massachusetts and is owned, controlled, operated and managed by defendants Park Avenue Medical Associates, P.C., Park Avenue Medical Associates PLLC, Park Avenue Health Care Management, LLC and Park Avenue Health Care Management, Inc. (Park Avenue Medical Associates and its management companies are referred to herein collectively as "PAMA"). The individual Defendants are agents, employees, directors, officers and/or shareholders, members or partners of PAMA.

3.    Defendants have engaged in an ongoing, systematic and company-wide course of conduct to defraud Medicare (a health insurance program funded and sponsored by the Federal Government) and Medicaid (a health insurance program jointly funded and sponsored by the Federal Government and the States) by over-billing for services that were performed and by billing for services that were never performed in order to gain unauthorized and illegal monetary benefits. In so doing, Defendants have defrauded the United States and the States of New York, Connecticut and Massachusetts and have deceived and harmed the patients PAMA purports to serve. This scheme to defraud by Defendants consists of rampant, illegal abuse of Medicare and

Medicaid billing codes associated with behavioral health care services, specifically Current Procedural Terminology codes (hereinafter "CPT codes"), as specified by the American Medical Association (hereinafter the "AMA"), including but not limited to CPT code 90801 (hereinafter "90801"), which represents the "psychiatric diagnostic interview examination." The scheme to defraud has occurred as a result of intentional, unmonitored and widespread fraudulent record-keeping and billing activities and practices in connection with the treatment of patients insured by Medicare or Medicaid (hereinafter "Medicare beneficiaries" or "Medicaid beneficiaries") by behavioral health clinicians employed by or affiliated with PAMA (including psychiatrists, psychologists, licensed clinical social workers and nurse practitioners), combined with the intentional submission of fraudulent claims for payment to Medicare and Medicaid. These behavioral health clinicians were responsible for providing services to patients including but not limited to psychiatric consultation, medication management, psychological counseling and neuropsychological testing. In treating these patients, most of whom were elderly Medicare beneficiaries or Medicaid beneficiaries, PAMA's behavioral care staff deceived their patients and defrauded Medicare and/or Medicaid by submitting bills for services that were never performed or bills for unnecessary and/or unauthorized services.

4.     Defendants' fraudulent course of conduct includes: (i) fraudulently submitting, or causing to be submitted, claims for payment for a more complicated, exhaustive and/or time-consuming medical service than the services actually provided ("upcoding"); (ii) fraudulently submitting, or causing to be submitted, claims for payment for medical services that were not provided; (iii) fraudulently submitting, or causing to be submitted, claims for payment for medically unnecessary services; (iv) falsifying material information on charts, notes and other documents used by medical providers to record information concerning the treatment of

3

patients; (v) using falsified documents to obtain unearned Medicare and Medicaid payments; (vi) misrepresenting material facts in order to obtain unearned Medicare and Medicaid payments; and (vii) knowingly, with reckless disregard and/or with deliberate ignorance, engaging in or permitting to occur the aforementioned activities and practices. These acts and omissions violate the FFCA, the NYFCA, the CFCA and the MFCA, and, therefore, any and all fraudulent submissions for payment by any of the Defendants to Medicare and Medicaid are false claims within the meaning of the FFCA, the NYFCA, the CFCA and the MFCA.

5.    Pursuant to the FFCA, the NYFCA, the CFCA and the MFCA, Relator seeks to recover on behalf of the United States and the States of New York, Connecticut and Massachusetts damages and civil penalties arising from false claims for payment that Defendants and their agents and/or employees submitted or caused to be submitted to Medicare and the New York, Connecticut and Massachusetts Medicaid programs, as well as other Federal and State-funded health insurance programs and companies insuring patients in New York.

6.    The aforementioned fraudulent activities and practices have resulted in the submission by Defendants of thousands of claims for payment to health care programs funded and sponsored by the United States, the States of New York, Connecticut and Massachusetts and/or insured persons. As a result, the United States, the States of New York, Connecticut and Massachusetts, as well as Medicare and Medicaid beneficiaries, paid Defendants substantial amounts of money that would not have been paid but for Defendants' fraudulent activities and practices.

II.    **STATUTORY BACKGROUND**

7.    The FFCA, § 3729(a)(1), imposes liability on any person who, *inter alia*: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of [the FFCA] . . .".

8.     Pursuant to the FFCA, § 3729(b)(2)(A)(i), the term "claim" – "means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – is presented to an officer, employee or agent of the United States . . . ."

9.     Pursuant to the FFCA, § 3729(a)(1)(G), any person who violates the FFCA is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the United States.

10.     Pursuant to the FFCA, § 3730(b), the FFCA empowers persons having information regarding a false or fraudulent claim against the United States to bring an action on behalf of the United States and to share in any recovery.

11.     The NYFCA, §189(1) imposes liability on anyone who, *inter alia:* "(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (c) conspires to commit a violation of [the NYFCA]. . .".

12.     Pursuant to the NYFCA, § 188(1)(a)(i), the term "claim" – "means any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee or agent of the state or a local government . . . ."

13.     Pursuant to the NYFCA, § 189(1)(g), any person who violates the NYFCA is liable for a civil penalty of between $6,000 and $12,000 for each such claim, and up to three times the amount of the damages sustained by the State of New York.

14.    Pursuant to the NYFCA, § 190(2), the NYFCA empowers persons having information regarding a false or fraudulent claim against the State of New York to bring an action on behalf of the State and to share in any recovery.

15.    The CFCA, § 17b-301b, imposes liability on anyone who, *inter alia*: "(a) knowingly present[s], or cause[s] to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the [Connecticut] Department of Social Services; (b) knowingly make[s], use[s] or cause[s] to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the [Connecticut] Department of Social Services; (c) conspire[s] to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the [Connecticut] Department of Social Services . . .".

16.    Pursuant to the CFCA, § 17b-301a(2), the term "claim" – "means any request or demand, whether under a contract or otherwise, for money or property that is made to a contractor, grantee or other recipient if the state provides any portion of the money or property that is requested or demanded, or if the state will reimburse such contractor, grantee or other recipient for any portion of the money or property that is requested or demanded . . . ."

17.    Pursuant to the CFCA, § 17b-301b(b), any person who violates the CFCA is liable for a civil penalty of between $5,000 and $10,000 for each such claim, and up to three times the amount of the damages sustained by the State of Connecticut.

18.    Pursuant to the CFCA, § 17b-301d(a), the CFCA empowers persons having information regarding a false or fraudulent claim against the State of Connecticut to bring an action on behalf of the State and to share in any recovery.

6

19.     The MFCA,§ 5B, imposes liability on anyone who, *inter alia*:   "(a) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof; (c) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim . . .".

20.     Pursuant to the MFCA, § 5A(a), the term "claim" – means "any request or demand, whether pursuant to a contract or otherwise, for money or property which is made to an officer, employee, agent or other representative of the commonwealth, political subdivision thereof or to a contractor, subcontractor, grantee, or other person if the commonwealth or any political subdivision thereof provides any portion of the money or property which is requested or demanded, or if the commonwealth or any political subdivision thereof will reimburse directly or indirectly such contractor, subcontractor, grantee, or other person for any portion of the money or property which is requested or demanded."

21.     Pursuant to the MFCA, § 5B(9), any person who violates the MFCA is liable for a civil penalty of between $5,000 and $10,000 for each such claim, and up to three times the amount of the damages sustained by the State of Massachusetts.

22.     Pursuant to the MFCA, § 5C(2), the MFCA empowers persons having information regarding a false or fraudulent claim against the State of Massachusetts to bring an action on behalf of the State and to share in any recovery.

## III.   JURISDICTION AND VENUE

23.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367(a), and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

24.     Further, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint.

25.     Under 31 U.S.C. § 3730(e) and the comparable provisions of the NYFCA, CFCA and MFCA, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator, moreover, would qualify under those sections as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

26.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendants can be found in and transact business that is the subject matter of this lawsuit in the Southern District of New York.

27.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found and transact business that is the subject matter of this lawsuit in the Southern District of New York.

## IV.   PARTIES

28.     Relator, at all relevant times, was and still is a resident of Manhattan, State of New York and became an employee of PAMA beginning in 2007.  At PAMA, Relator was an account representative team leader.  In or about June, 2010, Relator gained the additional position of database system administrator.  Relator remained an account representative team leader and database system administrator until January, 2011.  As an account representative team leader and database system administrator, Relator held a supervisory role in PAMA's billing and collections department.  This department was directly responsible for submitting claims for payment to health insurance programs such as Medicare and Medicaid and for collecting the proceeds of payments from health insurance programs to PAMA.  Relator's responsibilities included direct and substantial involvement in reviewing PAMA's claims for payment submitted

to Medicare and Medicaid.  Relator also had significant access to PAMA's electronic database, which contained all of PAMA's medical and billing records.  Beginning in 2010, Relator gathered extensive documentary evidence which conclusively demonstrated that multiple members of PAMA's behavioral care staff were engaging in widespread fraudulent activities and practices.  As a result, Relator acquired direct, first-hand knowledge about PAMA's false claims submitted to Medicare and Medicaid for payment.

29.     Defendant PAMA provides a variety of health care services to thousands of elderly and disabled patients with on-site care at approximately 120 health care facilities in New York, Connecticut and Massachusetts. PAMA has over 200 physicians and other health care personnel on staff and is among the largest group practices in New York focused on providing services to residents of long-term care facilities.  PAMA patients include those in hospitals as well as those in skilled nursing facilities, long-term care nursing facilities and assisted living facilities.  PAMA's health care services include primary care services (including Geriatrics and Internal Medicine), specialty services (including Podiatry and Ophthalmology) and behavioral health services.  Upon information and belief, the vast majority of patients serviced by PAMA's behavioral health clinicians at hospitals, skilled nursing facilities, long-term care nursing facilities and assisted living facilities throughout the New York City area, as well as throughout the rest of the State of New York, and the States of Connecticut and Massachusetts, are age 65 or older and are Medicare and/or Medicaid beneficiaries.

30.     Defendant Park Avenue Medical Associates, P.C., at all relevant times, was and still is an owner, operator, and manager of PAMA and was and still is a New York professional corporation headquartered at 3 Barker Avenue, White Plains, New York and doing business in New York, Connecticut, and Massachusetts.

9

31.     Defendant Park Avenue Medical Associates PLLC, at all relevant times was and still is an owner, operator and manager of PAMA; and was and still is a New York professional service limited liability company headquartered at 451 Park Avenue South, New York, New York and doing business in New York, Connecticut and Massachusetts.

32.     Defendant Park Avenue Health Care Management, LLC, at all relevant times, was and still is an owner, operator and manager of PAMA and was and still is a New York limited liability company headquartered at 3 Barker Avenue, White Plains, New York and doing business in New York, Connecticut, and Massachusetts.

33.     Defendant Park Avenue Health Care Management, Inc., at all relevant times, was and still is an owner, operator and manager of PAMA and was and still is a New York business corporation headquartered at 1 North Lexington Avenue, White Plains, New York and doing business in New York, Connecticut and Massachusetts.

34.     Defendant Brad Markowitz (hereinafter "Markowitz"), at all relevant times, was and still is the president of PAMA and its management companies, and is a resident of the State of New York.  Upon information and belief, Markowitz was and still is directly responsible for managing and monitoring the billing practices of PAMA and its health care personnel, including behavioral care clinicians.  As discussed hereinafter, Markowitz has knowingly allowed PAMA's health care personnel, including behavioral care clinicians, to cause countless false claims for payment to be submitted to Medicare and Medicaid.

35.     Defendant Dr. Mitchel Kaplan (hereinafter "Dr. Kaplan"), at all relevant times, was and still is a board-certified psychiatrist, was and still is the Chairman and Chief Executive Officer of Park Avenue Medical Associates, P.C., was and still is a resident of the State of New York and did and still does provide behavioral care services to patients at various

10

nursing facilities and hospitals throughout the New York City area. Upon information and belief, Dr. Kaplan was and still is directly responsible for managing and monitoring the billing practices of PAMA and its health care personnel, including behavioral care clinicians. As discussed hereinafter, Dr. Kaplan, on numerous occasions, has knowingly participated in PAMA's submission of false claims for payment to Medicare and Medicaid.

36.     Defendant Dr. Daniel Sussman (hereinafter "Dr. Sussman"), at all relevant times, was and still is a board-certified psychiatrist, was and still is a director and/or officer of PAMA, was and still is the chief of PAMA's behavioral care staff, was and still is a resident of the State of New York and did and still does provide behavioral care services to patients at various nursing facilities and hospitals throughout the New York City area. Upon information and belief, Dr. Sussman was and still is directly responsible for managing and monitoring the billing practices of PAMA's behavioral care clinicians. As discussed hereinafter, Dr. Sussman, on numerous occasions, has knowingly participated in PAMA's submission of false claims for payment to Medicare and Medicaid.

37.     Defendant Dr. Antony Mendola (hereinafter "Dr. Mendola"), at all relevant times, was and still is a board-certified psychiatrist, was and still is a senior member of PAMA's behavioral care staff, was and still is a resident of the State of New York and did and still does provide behavioral care services to patients at various nursing facilities and hospitals throughout the New York City area. As discussed hereinafter, Dr. Mendola, on numerous occasions, has knowingly participated in PAMA's submission of false claims for payment to Medicare and Medicaid.

## V.   BACKGROUND INFORMATION

### A.   Medicare

### i.   Scope and Structure

38.     Medicare, a Federally-funded health insurance program created by Title XVIII of the Social Security Act of 1965 (hereinafter "Title XVIII"), pays for the costs of certain services and care provided to eligible aged and disabled beneficiaries.  In general, all persons 65 years of age or older who have been legal residents of the United States for at least five years are eligible for Medicare.  Thus, Medicare primarily benefits the elderly.

39.     Upon information and belief, Medicare provides health care coverage for approximately 45 million people.  Medicare Part A, the basic plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the basic plan of Medical Insurance, covers the cost of medically-necessary services like doctors' services, outpatient care, skilled nursing facility care, hospice, home health services and other medical services.  Together, Medicare Parts A and B comprise the health insurance plan for all eligible individuals age 65 and older and certain younger disabled persons.  Neither Part A nor Part B covers prescription drugs, long-term nursing care, or basic vision, dental or hearing-related care.

40.     The Centers for Medicare and Medicaid Services (hereinafter "CMS"), previously known as the Health Care Financing Administration, is a Federal agency within the United States Department of Health and Human Services (hereinafter "HHS") that administers Medicare and works in partnership with State governments to administer Medicaid, the State Children's Health Insurance Program and health insurance portability standards.

41.     The rules governing Medicare are set forth in Title XVIII, Federal regulations, and the manuals, rulings and other policy statements issued by CMS, including but

not limited to the Provider Reimbursement Manual, the Medicare General Information, Eligibility and Entitlement Manual and the CMS Online Manual System.

### ii.   Provider Participation Requirements

#### a.   Generally

42.     To be entitled to payment from Medicare, a provider is required to enter into a contract, known as a provider agreement, with HHS.  42 U.S.C. § 1395cc; Provider Reimbursement Manual § 2402.2; Medicare General Information, Eligibility and Entitlement Manual (MS Pub. 100-1) Ch. 5 § 10.1.  A provider is required to be familiar with the law, regulations and policies governing Medicare. MS Pub. 100-1 Ch. 1 § 20.3.

43.     Health care providers (such as PAMA) desiring to treat Medicare beneficiaries must apply to Medicare for a provider number, which is used for the processing and payment of claims.  By signing the provider application, the provider agrees to abide by Medicare rules and regulations.

44.     Upon receipt of a provider number, the provider may submit claims for payment to Medicare. In order to be paid by Medicare for services rendered to Medicare beneficiaries, all health care providers must comply with applicable statutes, regulations, and guidelines.

#### b.   Duty of Providers to Submit Truthful Bills and to Correct Known Errors and Falsehoods in Prior Bills

45.     With each submission of a claim for payment to Medicare, the provider expressly certifies to CMS that the claim is "correct and complete," and impliedly certifies that it is properly payable. Payment of any Medicare claim is further conditioned upon, among other things, the provider's ongoing compliance with all applicable conditions of participation in Medicare.

13

46. Providers are prohibited from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." 42U.S.C. §1320-a-7b(a)(1).

47. The requirement that providers be truthful in submitting claims for payment is a precondition for participation in Medicare, Medicaid, and other health insurance programs funded by the Federal Government and the States. 42 CFR §§1003.105, 1003.102(a)(1)-(2).

48. Providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other Federal health insurance programs are required to disclose those omissions or errors to the Government. 42 U.S.C. §1320-a-7b(a)(3).

c.     **Medical Necessity**

49. All providers that bill Medicare for health care services also have a duty to be knowledgeable about the statutes, regulations, and guidelines regarding coverage for those services. Medicare pays only for those medical services that are reasonable and necessary for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)(1)(A); see also 42 U.S.C. § 1320c-5(a)(1).

50. Similarly, Medicare regulations explicitly exclude from payment services that are not reasonable and necessary for the diagnosis or treatment of illness or injury. 42 C.F.R. § 41 1.15(k)(1).

51. Providers who participate in Medicare must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

52.     Providers may be excluded from participation in Medicare and other Federally-funded health care programs if they routinely bill Medicare for medically unnecessary items or services. 42 CFR § 1003.102.

53.     The medical necessity requirement applies not only to the treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary. For physician services, "medical necessity of a service is the overarching criterion" for determining which CPT code is appropriate. *See*, Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A).

54.     Providers submit bills to Medicare using Form CMS-1500. On the claim form, the provider certifies that the services were "medically indicated and necessary to the health of the patient. . . ." Form CMS-1500 may also be used to bill State Medicaid programs.

### d.     Medical Record Documentation

55.     Although CPT codes (as discussed hereinafter) are used by Medicare to determine appropriate levels of reimbursement for specific medical procedures and services, the CPT codes are not intended to substitute for adequate documentation in a patient's medical record of all medical services rendered. Patient medical records must also document the reason for the patient encounter and relevant history, physical examination findings and prior diagnostic test results; assessment, clinical impression or diagnosis; plan for care; time and date; and legible identity of the provider. The patient's progress, response to and changes in treatment, and revision of diagnosis should also be documented. If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred, and past and present diagnoses should be accessible. The documentation must support the CPT codes reported on the health

insurance forms. *See*, CMS's 2008 Documentation Guidelines for Evaluation and Management Services, at 5.

56.    Although documentation is important, the "volume of documentation should not be the primary influence upon which a specific level of service is billed." *See*, Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A). Instead the level of service should be determined, using the physician's medical judgment, based on the nature and severity of the patient's problem(s) and the required course of treatment.

### B.    Medicaid

### i.    Scope and Structure

57.    Medicaid, a health insurance program created by Title XIX of the Social Security Act of 1965, authorizes grants to States for medical assistance to children and blind, aged and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; see also 42 U.S.C. §§ 1396-1396v. Thus, Medicaid primarily benefits people and families with low incomes and disabled individuals. Medicaid is a means-tested program that is jointly funded by the States and the Federal Government and is managed by the States. The amount of Federal funding in a State's program is determined by a statutory formula set forth in 42 U.S.C. §§ 1396b(a) and 1396d(b).

58.    Upon information and belief, Medicaid provides health care coverage for approximately 53 million people. Each State administers its own Medicaid program while CMS monitors the State-run programs and establishes requirements for service delivery, quality, funding and eligibility standards. States provide up to half of the funding for the Medicaid program.

59.    A State that elects to participate in Medicaid must establish a plan for providing medical assistance to qualified beneficiaries. 42 U.S.C. § 1396a(a)-(b); *see also* 42

16

C.F.R. Part 430, Subparts A and B; CMS State Medicaid Manual § 13025. In exchange, the Federal Government, through CMS, pays to each participating State the Federal portion of the expenditures made by the participating State to providers and ensures that the States comply with minimum standards in the administration of Medicaid. 42 U.S.C. §§ 1396, 1396a, and 1396b.

### ii. Participation of New York, Connecticut and Massachusetts

60. The State of New York has elected to participate in Medicaid, has established a State plan under Medicaid and has promulgated regulations that implement the State plan. N.Y. Soc. Serv. L. §§ 363 *et. seq.*; 10 N.Y.C.R.R. Parts 85-86; 18 N.Y.C.R.R. Part 360. The New York State Department of Health (hereinafter "NYSDOH") is the sole Medicaid agency that has contracted with HHS to administer or supervise Medicaid in New York State. N.Y. Pub. Health L. § 201.1(v); see also 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b).

61. The States of Connecticut and Massachusetts have also elected to participate in Medicaid, have established State plans under Medicaid and have promulgated regulations to implement their State plans. The Connecticut Department of Social Services is the State agency responsible for administering Connecticut's Medicaid program. The Office of Health and Human Services is the State agency responsible for administering the Massachusetts Medicaid program, known as MassHealth.

62. Federal Medicaid law does not set precise requirements and States are free to set payment rates. Individuals or entities that provide services to Medicaid beneficiaries in New York submit claims for payment to NYSDOH or its local delegate agency. 42 C.F.R. § 430.0. Payments are made based on types and ranges of services, payment levels for services and administrative and operating procedures established by the State in accordance with Federal laws, statutes and rules. *Id.*

### iii. Provider Participation Requirements

63.   In New York, a provider that treats Medicaid beneficiaries may only submit claims for reimbursement for services that have been provided in compliance with Title 18 of the New York Code of Rules and Regulations. 18 N.Y.C.R.R. § 504.6(d). By enrolling in the New York State Medicaid program, a provider agrees to comply with the rules, regulations and official directives of NYSDOH. 18 N.Y.C.R.R. § 504.3(i).   Upon information and belief, providers in Connecticut and Massachusetts are bound by similar rules and regulations.

64.   18 N.Y.C.R.R. § 515.2 provides, in pertinent part:

(a) Unacceptable practices under the medical assistance program.  (1) . . . conduct by a person which is contrary to the official rules and regulations of [NYSDOH]; (2) . . . conduct by a person which is contrary to the published fees, rates, claiming instructions or procedures of [NYSDOH]; (4) . . . conduct by a person which is contrary to the regulations of [HHS] promulgated under [Title XIX]; (b) Conduct included. An unacceptable practice is conduct which constitutes fraud or abuse and includes the practices specifically enumerated in this subdivision. (1) False claims: (i) Submitting, or causing to be submitted, a claim or claims for unfurnished medical care, services or supplies; (2) False statements: (i) making or causing to be made any false, fictitious or fraudulent statement or misrepresentation of material fact in claiming a medical assistance payment. or for use in determining the right to payment; (3) Failure to disclose: Having knowledge of any event affecting the right to payment of any person and concealing or failing to disclose the event with the intention that a payment be made when not authorized, or in a greater amount than due.

65.   Federal regulations are also strict with regard to Medicaid fraud, abuse and waste.  Payments to providers are permitted only for provider practices consistent with sound fiscal, business, or medical practices, or for services that are medically necessary and meet professionally recognized standards for health care. 42 U.S.C. § 1396(a); 42 C.F.R. § 433(f) (§§ 433.300, *et seq.*); 42 C.F.R. § 455.2.

66.     CMS defines "abuse" as improper behaviors or billing practices including, but not limited to billing for a non-covered service, misusing codes on claims or inappropriately allocating costs on a cost report.

## C.  PAMA's Participation in Medicare and Medicaid

67.     Upon information and belief, the majority of PAMA's thousands of elderly and disabled patients in New York, Connecticut and Massachusetts are Medicare and/or Medicaid beneficiaries.  Thus, PAMA receives millions of dollars annually as payment from the Federal Government and the States for services funded under Medicare, Medicaid and other Federal and State-funded health insurance programs.

68.     At all relevant times, PAMA participated in Medicare and in the New York, Connecticut and Massachusetts Medicaid programs.   Fundamentally, compliant participation in those programs, pursuant to an express contract of participation, is a prerequisite to receiving any payments for services to patients. Providers that desire to participate in Medicare and the State Medicaid programs must certify compliance with the conditions of participation before being extended a participation contract and accepted into either program as a provider-participant.   The continuing conditions of participation ensure that public funds are never paid for unnecessary costs and that public funds are never paid for services inconsistent with sound fiscal, business or medical practices, or for services that are not medically necessary or that fail to meet professionally recognized standards for health care.

69.     Multi-specialty health care providers, such as PAMA, typically contract with facilities or hospitals to provide patients at those facilities or hospitals with the medical care needed by those individuals – whether payment is to be made by Medicare, Medicaid, another State-funded health care program, private insurance or the patient. Upon information and belief, in some instances, PAMA and a facility contract for the facility to outsource all of its medical

19

billing (including coding, data entry and collections) to PAMA, with the facility paying a portion of PAMA's clinicians' salaries in return.

70.    Medicare, Medicaid and other health insurance programs provide payment to PAMA based on the particular health care service provided to a patient.   Thus, PAMA generates revenue by providing medical care to patients and then submitting claims for payment to the patients' health insurance program, which then reimburses PAMA by releasing payment to PAMA for services purportedly rendered.

71.    Typically, physicians and other health care personnel employed by PAMA keep track of medical services provided to each patient by filling out Encounter Forms, which contain all of the information necessary for PAMA's account representatives to process each claim for payment in an orderly manner.  The necessary information generally includes patient name, patient date of birth, date of service, location of service, name of provider, service provided and, often, a diagnosis.  PAMA's physicians and other health care personnel submit their encounter forms to PAMA's account representatives, who enter the information contained in the encounter forms into PAMA's electronic database, prepare each claim for submission to the appropriate health insurance program and then electronically submit each claim directly to the appropriate health insurance program (including Medicare and Medicaid) using Form CMS-1500 or other appropriate form.

72.    During the relevant periods, Medicare and the New York, Connecticut and Massachusetts Medicaid programs paid PAMA for purportedly rendering health care services based on PAMA's submission of false claims and false certifications of compliance with Federal laws and regulations and conditions of participation, as set forth herein.

**D.**   **Coding in Medicare and Medicaid Reimbursement: Current Procedural Terminology Codes, the Healthcare Common Procedure Coding System, the Physician Fee Schedule and the National Correct Coding Initiative**

73.     Medicare and Medicaid payment, like other health insurance programs, are code-based in order to ensure efficiency and uniformity. CPT codes, which are developed, maintained and copyrighted by the AMA, are numbers (typically five digits) which are used to identify medical services and procedures furnished by physicians and other health care professionals, including medical, surgical and diagnostic services. CPT codes typically represent a service and an amount of time associated with that service. For example, CPT code 99406 represents "Smoking and tobacco-use cessation counseling visit; intermediate, greater than 3 minutes up to 10 minutes" and code 99407 represents "Smoking and tobacco-use cessation counseling visit; intensive, greater than 10 minutes."

74.     Decisions regarding the addition, deletion or revision of CPT codes are made by the AMA. The CPT codes are republished and updated annually by the AMA. Correct use of CPT codes, including when, how often and under what circumstances a particular CPT code may be billed, are based on the CPT guidelines published annually by the AMA. Pursuant to 45 C.F.R. § 162.1002(a)(5), the AMA's CPT code descriptions and usage guidelines have been adopted by Medicare and Medicaid and published in CMS's National Correct Coding Initiative Coding Policy Manual for Medicare Services (National Correct Coding Initiative ,hereinafter "NCCI," Coding Policy Manual, hereinafter the "NCCI Manual") and also published on the National Government Services (hereinafter "NGS") website. CPT codes are used by health insurance programs, including Medicare and Medicaid, to determine the amount of payment that a provider will receive for health care services rendered.

75.     Physicians and other health care professionals, including PAMA's behavioral care clinicians, write CPT codes on Encounter Forms to indicate which services have been provided to patients. Those codes are also included on Form CMS-1500 submitted by providers, including PAMA, to Medicare and Medicaid in order to obtain payment from those programs. Form CMS-1500 sets forth the diagnostic code describing the patient's presenting condition ("ICD codes" as discussed hereinafter) and the procedural codes (CPT codes).

76.     Medicare and Medicaid use the Healthcare Common Procedure Coding System (hereinafter the "HCPCS"), which is divided into two principal subsystems, Level I and Level II. Level I of the HCPCS is comprised of the AMA's five-digit numeric CPT codes.

77.     Initially, use of CPT codes was voluntary, but with the implementation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") use of the HCPCS for transactions involving health care information became mandatory.  Indeed, the HCPCS system is mandated by HIPAA and regulated by CMS, and the data for the HCPCS system appears in the Federal Register. Medicare requires that Medicare Part B claims be submitted using CPT Codes.  45 C.F.R. § 162.1002(a)(5) establishes HCPCS as the coding system that entities covered by HIPAA are to use for physician services and other health care services.

78.     45 C.F.R. § 162.1002(a)(5) provides, in pertinent part:

"The Secretary [of HHS] adopts the following maintaining organization's code sets as the standard medical data code sets: (a) For the period from October 16, 2002 through October 15, 2003:

(5) The combination of Health Care Financing Administration Common Procedure Coding System (HCPCS), as maintained and distributed by HHS, and Current Procedural Terminology, Fourth Edition (CPT–4), as maintained and distributed by the American Medical Association, for physician services and other health care services. These services include, but are not limited to, the following:

(i) Physician services.

22

(ii) Physical and occupational therapy services.

(iii) Radiologic procedures.

(iv) Clinical laboratory tests.

(v) Other medical diagnostic procedures.

(vi) Hearing and vision services.

(vii) Transportation services including ambulance."

79.     Under Medicare rules, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS").  RBRVS payments are based on the HCPCS.  In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them.  Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate (conversion factor).

80.     Under the RBVRS system, each CPT code is given a value - an average amount of money Medicare will pay a provider for the service represented by the particular CPT code. Then, cities and other geographic areas are assigned a relative value amount (hereinafter "RVU") - that is a percentage, higher or lower, of the average HCPCS payment.  Depending on where a medical service is provided, the RVU will be higher or lower than the average, based on the cost of doing business. So, for example, the cost of doing business is higher than average in New York City.  The average equals 1.0, thus the RVU for New York City might be 1.3. In Birmingham, Alabama, which has a much lower cost of doing business, the RVU might be .75.

81.     The Geographic Practice Cost Index (hereinafter "GPCI") is the amount paid for each CPT code once the average has been multiplied by the RVU. The GPCI is not a percentage - it's the actual dollar amount of a medical service. Thus, the average cost (RVU =

23

1.0) for a particular code might be $100. In New York City, where the RVU is 1.3, that code would be worth $130. In Birmingham, Alabama where the RVU is .75, that code would be worth $75.

82.    When combined, the CPT code payment amount, the RVU and the GPCI result in a Fee Schedule with provider's fees for every service or procedure that may be provided to patients. Separate Fee Schedules are published for each geographic area identified by CMS. For example, CMS divides New York State into five areas, each with its own Fee Schedule: 01, 02, 03, 04 and 99.

83.    Payment is sent directly from Medicare to the provider according to the Medicare payment rates, which are listed in the Medicare fee schedule.  The fee schedule contains a complete listing of fees used by Medicare to pay doctors or other providers, as well as a comprehensive listing of fee maximums used to pay providers on a fee-for-service basis. Medicare payment rates are set by Federal legislation, and govern how much PAMA and other providers receive for Medicare claims.

84.    HIPAA required CMS to adopt standards for the coding systems that are used for reporting health care transactions.  Thus, use of CPT codes is monitored and regulated by CMS and subject to strict limitations to prevent abuse, fraud and incorrect use of codes.  To that end, CMS developed the NCCI to promote national correct coding methodologies and to control improper coding leading to inappropriate payment in Medicare Part B claims, which are the type of Medicare claims typically submitted by PAMA in connection with patients covered under Medicare. CMS developed its coding policies based on coding conventions defined in the AMA's CPT manual, national and local policies, coding guidelines developed by national

medical societies, analysis of standard medical and surgical practices and a review of current coding practices. CMS annually updates the NCCI Manual.

85.    Medicare carriers implemented NCCI payment methodology on January 1, 1996. The Patient Protection and Affordable Care Act (Public Law 111-148) Section 6507 (Mandatory State Use of NCCI) required State Medicaid programs to incorporate "NCCI methodologies" in their claims processing systems by October 1, 2010 in order to control improper coding leading to inappropriate Medicaid payments to providers.

86.    As required by AMA guidelines, and thus by CMS and by State Medicaid programs, certain codes may not be billed together or may not be used more than a mandated amount within a given time period, among other limitations and restrictions. Just as importantly, most codes are timed, or, if untimed, have minimum amounts of time that are appropriate for the procedure or task represented by the code. As the introduction to the NCCI Manual notes: "Procedures should be reported with the HCPCS codes that most comprehensively describe the services performed."

87.    As noted in the introduction to the NCCI Manual, use of CPT codes creates opportunities for unscrupulous "providers to manipulate coding in order to maximize payment." Illegal manipulation of CPT codes is an especially tempting fraud for unscrupulous behavioral care clinicians, since reporting a patient's psychiatric condition is generally open to greater manipulation than reporting a patient's physical condition.

88.    As detailed in the NCCI Manual, examples of the types of fraudulent manipulation of CPT codes that providers can utilize in order to secure unlawful monetary gain include: (i) using a CPT code that represents a procedure or service involving more time or greater complication (and thus results in greater reimbursement) than the appropriate CPT code

25

("upcoding"); (ii) using a CPT code that represents a procedure or service that was not actually provided; (iii) performing a medically unnecessary procedure or service in order to gain greater payment than the payment that would have resulted from using the appropriate procedure or service, or no procedure or service at all (a variation of upcoding); (iv) diagnosing a patient with a more serious condition or illness than the patient actually has in order to place the patient on a more aggressive and costly treatment plan; and (v) using multiple CPT codes for a group of procedures or services that are covered by a single comprehensive code, thus fragmenting one procedure or service into component parts and coding each component part as if it were a separate procedure or service ("unbundling" or "downcoding").

89.     Medicaid has adopted the NCCI Manual, with some revisions.  The NCCI Coding Policy Manual for Medicaid Services contains HCPCS coding policies similar to the policies of Medicare.

### E.     CPT Codes commonly used in Behavioral Care

90.     Five CPT codes commonly used by behavioral care clinicians, including PAMA's psychiatrists, psychologists, nurse practitioners and clinical social workers, are CPT code 90801 (hereinafter "90801"), CPT code 99307 (hereinafter "99307"), CPT code 99308 (hereinafter "99308"), CPT code 99309 (hereinafter "99309") and CPT code 99310 (hereinafter "99310").

### i.     90801

91.     According to the AMA's publication 2011 CPT Professional Edition, 90801 represents the "psychiatric diagnostic interview examination" and "includes a history, mental status, and a disposition, and may include communication with family or other sources, order and medical interpretation of laboratory or other medical diagnostic studies."  The NGS website provides a similar description of 90801: "The diagnostic examination includes a mental

status exam, psychiatric history, complete medical history, establishment of an initial diagnosis,

and establishment of initial treatment plan."

> 92.     The March 2001 edition of the AMA's publication CPT Assistant

describes 90801 as follows:

> ". . . psychiatric diagnostic interview examinations are most often
> performed during the initial phase of treatment, as the goal of the
> examination is to establish a diagnosis and treatment protocol for the
> patient. Pre-service work depends on how the patient was referred. At a
> minimum, the work includes a telephone discussion with the person who
> initiated the referral (e.g., physician, family, law enforcement agent,
> employer). May include review of records from referral source and lab or
> consultation reports. Intra-service work includes a complete psychiatric
> history including present illness; past history, family history, complete
> mental status examination; selected physical examination; arrangements
> for laboratory tests; establishing a definitive diagnosis or a narrow enough
> differential diagnosis to warrant a treatment plan; decision making
> concerning need for degree of supervision (e.g., hospitalization); and
> counseling the patient regarding diagnosis and options for treatment.
> Post-service work includes arranging further studies and further care, a
> report or discussion with referral source, arranging to obtain additional
> information and dictating the results of the examination.  Frequently,
> additional communication is required with the patient and/or family after
> results of studies are known or due to side effects of instituted treatment."

> 93.     Pursuant to Medicare rules and regulations, 90801 may be used *only* once

per provider at the onset of a patient's illness or suspected illness, and may be used again for the

same patient *only* if a new episode of illness occurs.  As stated on the NGS website: "Only one

CPT 90801 can be billed per episode of illness.  This applies to different specialties within the

same group practice as well as independent practitioners.  Therefore, if a provider has been paid

for CPT 90801 for a patient, another provider, regardless of specialty, cannot be paid for a

separate CPT 90801 for that same patient during that episode of illness."

94.     According to CMS, illness episodes begin when patients are admitted to a skilled nursing facility or hospital and end after the patient has been out of the facility or hospital for 60 consecutive days.

95.     90801 is a single untimed service. Therefore, multiple uses of 90801 per patient per date of service are not permissible, regardless of the number of behavioral care clinicians involved in the examination process. Although 90801 is not a timed code, between 45 minutes and one hour is typically required for a clinician to provide this service.

#### ii.     99307, 99308, 99309 and 99310

96.     99307, 99308, 99309 and 99310 are "Evaluation and Management" or "E &M" services.   E & M services are divided into broad categories such as office visits, hospital visits and consultations. Under the CPT coding system, standard office visits – whether conducted in a physician office, in a hospital or in another setting – are classified as E & M services.   Each category of E&M code (such as office visits, hospital visits and consultations) has a range of codes reflecting a range of the intensity of services provided. Higher level codes indicate a more intensive service.   Accordingly, providers are paid more for a higher level code (such as 99310) than a lower code (such as 99307).

97.     In 1995, 1997 and again in 2008, CMS issued Documentation Guidelines for E&M Services.   To determine the appropriate level of E&M services to be coded, seven components must be assessed.   These components are: (1) patient history; (2) physical examination; (3) medical decision making; (4) counseling; (5) coordination of care; (6) the nature of the presenting problem; and (7) the time involved in meeting with the patient.

98.     The first three components (patient history, physical examination and medical decision making) are the most important elements for coding purposes, because the

28

greater the intensity of the history, examination and medical decision making components, the higher the level of CPT E&M code that may be assigned.

99.     As with the other elements of the office visit, a physician may not conduct a more intensive examination simply to generate a higher CPT code and, thus, greater compensation.   The type and intensity of the examination must be determined by medical necessity.

100.     According to the AMA, 99307 involves subsequent nursing facility care, per day, for the evaluation and management of a patient, and requires at least two of these three components: (a) a problem focused interval history; (b) a problem focused examination; (c) straightforward medical decision-making.   Usually, the patient is stable, recovering, or improving.  Clinicians typically spend 10 minutes with a patient for 99307.

101.     According to the AMA, 99308 involves subsequent nursing facility care, per day, for the evaluation and management of a patient, and requires at least two of these three components: (a) an expanded problem focused interval history; (b) an expanded problem focused examination; (c) medical decision-making of low complexity.  Usually, the patient is responding inadequately to therapy or has developed a minor complication.  Clinicians typically spend 15 minutes with a patient for 99308.

102.     According to the AMA, 99309 involves subsequent nursing facility care, per day, for the evaluation and management of a patient, and requires at least two of these three components: (a) a detailed interval history; (b) a detailed examination; (c) medical decision-making of moderate complexity.  Usually, the patient has developed a significant complication or a significant new problem.  Clinicians typically spend 25 minutes with a patient for 99309.

103.    According to the AMA, 99310 involves subsequent nursing facility care, per day, for the evaluation and management of a patient, and requires at least two of these three components: (a) a comprehensive interval history; (b) a comprehensive examination; (c) medical decision-making of high complexity.  The patient may be unstable or may have developed a significant new problem requiring immediate physician attention.  Clinicians typically spend 35 minutes with a patient for 99310.

### iii.    Contrast in Reimbursement Rates

104.    Since 90801 is used for diagnosis and includes a detailed examination and patient history, 90801 claims for payment are reimbursed at substantially higher rates than claims for payment involving other applicable CPT codes, including 99307, 99308, 99309 and 99310, regardless of location, as detailed in the Medicare Fee Schedule for Physicians, and the Medicare Fee Schedule for Clinical Psychologists and Clinical Social Workers.

105.    For example, according to the Medicare Fee Schedule for Physicians for New York Area 1 (Area 1 consists of New York County) effective June 1, 2010, 90801 claims for payment were reimbursed at the rate of $143.94 for physicians in a facility setting, 99307 claims for payment were reimbursed at the rate of $47.21, 99308 claims for payment were reimbursed at the rate of $72.74, 99309 claims for payment were reimbursed at the rate of $95.59 and 99310 claims for payment were reimbursed at the rate of $141.39.

### F.    International Statistical Classification of Diseases Code System

106.    In addition to CPT codes, behavioral care providers use International Statistical Classification of Diseases and Related Health Problems codes ("ICD codes"), which are published by the World Health Organization and used to classify diagnoses, including diseases and injuries.